# Illinois Official Reports

## Appellate Court

---

### *People v. Burns*, 2015 IL App (4th) 140006

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. TARON R. BURNS, Defendant-Appellee. |
| District & No. | Fourth District<br>Docket No. 4-14-0006 |
| Filed | January 30, 2015 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court properly granted defendant's motion to suppress the cannabis discovered in her apartment pursuant to a search warrant issued on the basis of a drug-detection dog's alert after a sniff of the front door of defendant's apartment, since the warrantless dog sniff violated the fourth amendment as held in *Jardines*, to the extent that the police conduct that took place when the dog sniffed as it stood with the police at the entrance of defendant's apartment occurred in a constitutionally protected area, especially when the entrances to the apartment building were locked and it was 3 a.m.; furthermore, the warrantless use of the dog affected the judge's decision to issue the search warrant, and the evidence seized pursuant to the warrant was the fruit of the poisonous tree and subject to the exclusionary rule. |
| Decision Under Review | Appeal from the Circuit Court of Champaign County, No. 13-CF-66; the Hon. Harry E. Clem, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal    Julia Rietz, State's Attorney, of Urbana (Patrick Delfino, David J. Robinson, and David E. Mannchen (argued), all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

L. Keith Hays (argued), of Keith Hays Law Office, of Monticello, for appellee.

Panel    JUSTICE KNECHT delivered the judgment of the court, with opinion.
Justices Turner and Appleton concurred in the judgment and opinion.

**OPINION**

¶ 1      At approximately 3:20 a.m. on January 10, 2013, two police officers from the Urbana police department entered the locked apartment building in which defendant, Taron R. Burns, lives. The officers were interested in apartment No. 10, defendant's apartment. They did not have a search warrant and were accompanied by Hunter, a trained drug-detection dog. After sniffing the front door to apartment No. 10, Hunter alerted to the presence of narcotics. On the basis of this drug sniff, the police obtained a search warrant and searched defendant's apartment.

¶ 2      In January 2013, the State charged defendant with unlawful possession with intent to deliver more than 500 grams but not more than 2,000 grams of cannabis (720 ILCS 550/5(e) (West 2012)). In April 2013, defendant filed a motion to suppress evidence discovered in the search. She argued the warrantless dog sniff of her apartment's front door violated the fourth amendment as held in *Florida v. Jardines*, 569 U.S. ___, 133 S. Ct. 1409 (2013). In October 2013, the trial court agreed and granted defendant's motion to suppress.

¶ 3      The State argues the trial court erred in granting defendant's motion to suppress. The State contends *Jardines* does not apply to this case because the police did not invade upon the curtilage to defendant's residence and defendant did not have a reasonable expectation of privacy in the common areas of her apartment building. In the event we conclude *Jardines* applies to this case, the State argues the good-faith exception to the exclusionary rule applies and evidence seized pursuant to a search warrant may be admitted if, apart from the dog sniff, the lawfully obtained information contained in the warrant application amounted to probable cause. We conclude *Jardines* applies and affirm.

¶ 4      I. BACKGROUND

¶ 5      Defendant lives in a three-story apartment building consisting of 12 apartments. The building has two entrances, on the east and west sides, both of which are locked. Defendant lives on the third floor, in apartment No. 10. A storage closet and apartment No. 9 are the only

other areas accessible from the third-floor landing. The apartment doors are directly across from one another and the storage-room door faces the stairwell.

¶ 6   On January 10, 2013, Matthew Mecum of the Urbana police department went to defendant's apartment building to confirm an address. He was dressed in plain clothes and his badge and firearm were not visible. The entry door was locked, as it was every time he went to the building. He knocked and a resident let him into the building.

¶ 7   At approximately 3:20 a.m. on January 10, 2013, Michael Cervantes of the Urbana police department entered defendant's apartment building with a drug-detection dog named Hunter. Officer Cervantes was let into the building by another police officer. He was specifically interested in apartment No. 10. Once inside, he conducted a sweep of the third-floor landing. He started at apartment No. 9, continued to the storage unit located between the two apartments, and then swept the front door to apartment No. 10. Hunter alerted to the odor of illegal drugs at defendant's front door. Cervantes and Hunter proceeded to the first floor and swept two more apartment doors.

¶ 8   On January 10, 2013, Mecum applied for a warrant to search defendant's apartment. The warrant application stated on "01/10/2012 [*sic*]," Cervantes and Hunter conducted a sweep of apartment No. 10, "along with three additional apartment doors and a storage closet door." Hunter "alerted" on the "apartment door" of apartment No. 10. Additionally, the warrant application stated the Urbana police department received a "CrimeStoppers" tip defendant was receiving shipments of marijuana from her brother, whose name was unknown. The shipments were from California and on November 21, 2012, defendant received a shipment of two pounds of marijuana. The tipster informed the police defendant was selling approximately two pounds of marijuana a week and the tipster knew this because defendant sold another type of drug to the tipster's girlfriend. The tipster also stated defendant "has a Facebook page showing US currency." The warrant application provided information about defendant's contacts with police in 2003 and 2008, both of which related to the possession of cannabis. Mecum visited defendant's Facebook page and observed "numerous pictures containing images for the legalization of marijuana ***[,] a picture containing actual marijuana ***[,] and a picture containing large amounts of US currency." Mecum had visited defendant's apartment building on January 10, 2013, and observed a package addressed to defendant–it is not clear where in the building the package was located. "The package observed had a return shipping label which listed a [']Ben Jones['] in Oakland[,] California."

¶ 9   The same day, a judge granted the search warrant application and police conducted a search of defendant's apartment. The police recovered 1,011.99 grams of cannabis.

¶ 10   In January 2013, the State charged defendant as previously described.

## A. Defendant's Motion To Suppress

¶ 12   In April 2013, defendant filed a motion to suppress, arguing the warrantless use of a drug-detection dog to sniff the entrance to her apartment was a violation of the fourth amendment (U.S. Const., amend. IV) as held in *Jardines*.

¶ 13   In October 2013, the trial court held a hearing on defendant's motion to suppress. The evidence presented is summarized above. Defendant argued *Jardines* is not limited to those individuals who live in a single-family residence, because the opinion did not include this information. Rather, all "we know [is] that the entrance to [Jardines'] home was regarded as

part of his home." Because *Jardines* protects against a warrantless dog sniff of a home's entrance, the use of a drug-detection dog to sniff defendant's apartment's door violated the fourth amendment. The State argued *Jardines* should not be applied because there is a distinction between a single-family residence and a multiunit dwelling. Residents in a multiunit dwelling have a lower reasonable expectation of privacy because of an apartment building's layout and "any resident in that entire apartment building could walk up to [a]partment [No.] 10." The State argued this court's decision in *People v. Trull*, 64 Ill. App. 3d 385, 380 N.E.2d 1169 (1978), which held the common entries and hallways of a locked apartment building were protected by the fourth amendment, relied on federal case law which had been abandoned and therefore should not be followed.

¶ 14 Immediately after the hearing, the trial court found the police officers acted in objective good faith on the law as it existed at the time of the search, which was before *Jardines* was decided, and denied the motion to suppress.

¶ 15 B. Defendant's Motion To Reconsider

¶ 16 In October 2013, defendant filed a motion to reconsider, arguing the trial court misapprehended the retroactive applicability of *Jardines*. Defendant argued *Jardines* applied to this case because under *Griffith v. Kentucky*, 479 U.S. 314 (1987), a fourth amendment case applies to all cases that were not final at the time the United States Supreme Court decision was rendered. She also argued this case was substantially similar to the facts in *McClintock v. State*, 405 S.W.3d 277, 284 (Tex. App. 2013), which held the landing outside the defendant's apartment was part of the apartment's curtilage and, consistent with *Jardines*, the police conducted a search when they used a drug-detection dog to investigate defendant's apartment from within the curtilage.

¶ 17 At the hearing on defendant's motion to reconsider, the State conceded *Jardines* retroactively applied to this case but argued it did not apply to the facts of this case. The State also argued the officers could have acted in good-faith reliance upon the then-existing precedent in using a drug-detection dog to sniff the apartment door, and the information contained in the warrant application, without the dog sniff, amounted to probable cause.

¶ 18 C. The Trial Court's Ruling

¶ 19 In December 2013, the trial court issued a written order granting defendant's motion to suppress. The court found *Trull* had not been overturned and was controlling authority. The court noted the dissent in *Jardines* agreed there is no license for a visitor to come to the front door in the middle of the night without an express invitation. See *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1422 (Alito, J., dissenting, joined by Roberts, C.J., and Kennedy and Breyer, JJ.). It also noted the warrant application erroneously stated the canine sweep occurred on January 10, 2012, and was sworn to with the incorrect date. The court concluded, "The dog sniff of Defendant's apartment door, located within a locked apartment building, at 3:20 a.m. on January10, 2013, violated Defendant's Fourth Amendment rights." It also found the good-faith exception did not apply and probable cause was not established if the paragraphs pertaining to the dog sniff were excised from the search warrant application.

¶ 20 In December 2013, the State filed a certificate of impairment with the trial court. See Ill. S. Ct. R. 604(a) (eff. Feb. 6, 2013).

¶ 21    This appeal followed.

¶ 22                                    II. ANALYSIS

¶ 23    The State argues the trial court erred in granting defendant's motion to suppress. It asserts *Jardines* does not apply to this case as there was no invasion of the curtilage and defendant did not have a reasonable expectation of privacy in the apartment building's common areas. In the event we conclude *Jardines* applies to this case, the State argues the evidence obtained pursuant to the search warrant should not be suppressed because the officers were acting in good-faith reliance upon the law as it existed prior to *Jardines*, and the evidence seized pursuant to a search warrant may be admitted if, apart from the dog sniff, the lawfully obtained information contained in the warrant amounted to probable cause.

¶ 24                               A. Standard of Review

¶ 25    When reviewing a trial court's decision regarding a motion to suppress, the reviewing court applies a two-part standard of review. *People v. Cregan*, 2014 IL 113600, ¶ 22, 10 N.E.3d 1196. The reviewing court gives great deference to the trial court's factual findings and will reverse those findings only if they are against the manifest weight of the evidence. *Id.* The trial court's legal ruling on whether the evidence should be suppressed is reviewed *de novo*. *Id.* The parties do not dispute the trial court's factual findings and we review the court's legal ruling *de novo*.

¶ 26                              B. The Fourth Amendment

¶ 27    The fourth amendment to the United States Constitution prohibits unreasonable searches and seizures, which violate the "right of the people to be secure in their persons, houses, papers, and effects." U.S. Const., amend. IV.

¶ 28                               C. Florida v. Jardines

¶ 29    In *Jardines*, the United States Supreme Court considered whether the use of a drug-detection dog on a porch "to investigate the contents of the home" constituted a search within the meaning of the fourth amendment. *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1413. There, the Miami-Dade police received an unverified tip marijuana was being grown in Jardines' home. *Id.* at ___, 133 S. Ct. at 1413. A month later, the police went to Jardines' home with a drug-detection dog. The dog approached Jardines' front porch and, after sniffing the base of the front door, gave a positive alert for narcotics. On the basis of the dog sniff, police applied for and received a warrant to search the residence. When the warrant was executed, the police discovered marijuana plants. *Id.* at ___, 133 S. Ct. at 1413.

¶ 30    The Supreme Court began its analysis by emphasizing the fourth amendment establishes:

"a simple baseline, one that for much of our history formed the exclusive basis for its protections: When 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a "search" within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.' " *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1414 (quoting *United States v. Jones*, 565 U.S. ___, ___ n.3, 132 S. Ct. 945, 950 n.3 (2012)).

The Supreme Court's decision in *Katz v. United States*, 389 U.S. 347 (1967), which held property rights are not the sole measure of the fourth amendment's protections, may add to this baseline but it does not subtract from it. *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1414.

¶ 31    The *Jardines* Court first considered whether the police intruded upon a constitutionally protected area. The fourth amendment does not prevent all investigations conducted on private property, "[b]ut when it comes to the Fourth Amendment, the home is first among equals." *Id.* at ___, 133 S. Ct. at 1414. At the fourth amendment's core, "stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.' " *Id.* at ___, 133 S. Ct. at 1414 (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)). For fourth amendment purposes, the home includes "the area 'immediately surrounding and associated with the home,' " an area referred to as the curtilage. *Id.* at ___, 133 S. Ct. at 1414 (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984)). "This area around the home is 'intimately linked to the home, both physically and psychologically,' and is where 'privacy expectations are most heightened.' " *Id.* at ___, 133 S. Ct. at 1415 (quoting *California v. Ciraolo*, 476 U.S. 207, 213 (1986)). The Court found there was "no doubt" the police officers entered the curtilage of Jardines' home as "[t]he front porch is the classic exemplar of an area adjacent to the home and 'to which the activity of home life extends.' " *Id.* at ___, 133 S. Ct. at 1415 (quoting *Oliver*, 466 U.S. at 182 n.12).

¶ 32    Finding the police officers had intruded upon a constitutionally protected area, the Supreme Court turned to whether the officers had a license to enter this area with a drug-detection dog. The Court recognized police officers "need not 'shield their eyes' when passing by the home 'on public thoroughfares,' " but an officer's ability to gather information is "sharply circumscribed" when he or she steps off the public thoroughfare. *Id.* at ___, 133 S. Ct. at 1415 (quoting *Ciraolo*, 476 U.S. at 213). There is an implicit license for individuals, including the police, "to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Id.* at ___, 133 S. Ct. at 1415. "Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.' " *Id.* at ___, 133 S. Ct. at 1416 (quoting *Kentucky v. King*, 563 U.S. ___, ___, 131 S. Ct. 1849, 1862 (2011)). However, there is no customary invitation for the police to introduce "a trained police dog to explore the area around the home in hopes of discovering incriminating evidence." *Id.* at ___, 133 S. Ct. at 1416. The Court explained, to find a visitor "marching his bloodhound into the garden before saying hello and asking permission, would inspire most of us to–well, call the police." *Id.* at ___, 133 S. Ct. at 1416.

¶ 33    In closing, the Court noted it did not need to decide whether the officer's investigation violated Jardines' reasonable expectation of privacy under *Katz*. "The *Katz* reasonable-expectations test 'has been *added to*, not *substituted for*,' the traditional property-based understanding of the Fourth Amendment, and so is unnecessary to consider when the government gains evidence by physically intruding on constitutionally protected areas." (Emphases in original.) *Id.* at ___, 133 S. Ct. at 1417 (quoting *Jones*, 565 U.S. at ___, 132 S. Ct. at 951-52). Nor did it need to consider whether *Kyllo v. United States*, 533 U.S. 27 (2001), applied because "when the government uses a physical intrusion to explore details of the home (including its curtilage), the antiquity of the tools that they bring along is irrelevant." *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1417.

¶ 34    Justice Kagan, joined by Justices Ginsburg and Sotomayor, concurred in the majority opinion but wrote to express the same result would have been reached by looking at Jardines' privacy interests under *Katz*. *Id.* at ___, 133 S. Ct. at 1418 (Kagan, J., concurring, joined by Ginsburg and Sotomayor, JJ.). Property concepts and privacy concepts will "align" in cases involving a search of a home as "[t]he law of property 'naturally enough influence[s]' our 'shared social expectations' of what places should be free from governmental incursions." *Id.* at ___, 133 S. Ct. at 1419 (quoting *Georgia v. Randolph*, 547 U.S. 103, 111 (2006)). If this case had been decided on privacy grounds, then it would have been resolved by *Kyllo*. In *Kyllo* the Court highlighted its "intention to draw both a 'firm' and a 'bright' line at 'the entrance to the house,' " and announced the rule: " 'Where, as here, the Government uses a device that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a "search" and is presumptively unreasonable without a warrant.' " *Id.* at ___, 133 S. Ct. at 1419 (quoting *Kyllo*, 533 U.S. at 40). Justice Kagan concluded the police's use of a drug-detection dog–a device not in general public use–to examine Jardines' home violated his expectation of privacy in his home. *Id.* at ___, 133 S. Ct. at 1420.

¶ 35                          D. *Jardines'* Application to This Case
¶ 36            1. *The State's Argument Fails To Engage Jardines' Property-Based Analysis*
¶ 37    In its initial brief, the State summarily stated "[t]here is simply no invasion of the curtilage when the police entered [the] common area of the apartment building" and immediately proceeded to argue defendant did not have a reasonable expectation of privacy in the common areas of the apartment building. This court then specifically requested the State to analyze this case using *Jardines'* property-based analysis. The State did not and responded by asserting *Jardines* "clearly demonstrated" the reasonable-expectation-of-privacy test is "to be used in determining the propriety of police conduct in approaching an individual's home." It is disingenuous for the State to argue *Jardines* does not apply to this case and ignore the rationale used in the majority opinion and focus its argument on the reasonable-expectation-of-privacy analysis used in Justice Kagan's concurrence. The reasonable-expectation-of-privacy test *adds* to the fourth amendment's baseline property-based protections; it "does not subtract anything from the Amendment's protections 'when the Government *does* engage in [a] physical intrusion of a constitutionally protected area.' " (Emphasis in original.) *Id.* at ___, 133 S. Ct. at 1414 (quoting *United States v. Knotts*, 460 U.S. 276, 286 (1983) (Brennan, J., concurring in the judgment, joined by Marshall, J.)). See also *Jones*, 565 U.S. at ___, 132 S. Ct. at 951 (noting "*Katz* did not narrow the Fourth Amendment's scope"). In determining whether *Jardines* applies to this case, we start with the *Jardines* rationale before determining whether the reasonable-expectation-of-privacy test applies.

¶ 38                          2. *Jardines' Property-Based Rationale Applies*
¶ 39    The State argues *Jardines* is distinguishable because defendant resides in a multiunit apartment building and not a single-family residence. The Supreme Court has generally "eschewed" bright-line rules when it comes to the fourth amendment (*Ohio v. Robinette*, 519 U.S. 33, 39 (1996)) and the State's argument the Court developed such a bright-line rule in *Jardines* is unpersuasive.

¶ 40     *Jardines* contains practically no information about the type, layout, or ownership of Jardines' residence. See *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1413. Despite this dearth of information about Jardines' residence, the State argues *Jardines* is restricted to a single-family residence. The State does not provide a citation to support its contention Jardines' residence was a single-family residence. Our review has found no mention of Jardines' residence as a single-family residence. The lack of information about Jardines' residence undermines the State's attempts to draw a distinction between a single-family residence and a multiunit apartment building.

¶ 41     The State has not identified a single Supreme Court case limiting the fourth amendment's application on the basis of the type of residence involved. Our research shows the Supreme Court has encountered various types of residences in its fourth amendment jurisprudence. See *Silverman*, 365 U.S. at 506 (row house); *Payton v. New York*, 445 U.S. 573, 576 (1980) (apartment); *Minnesota v. Olson*, 495 U.S. 91, 94 (1990) (duplex); *Soldal v. Cook County, Illinois*, 506 U.S. 56, 58 (1992) (mobile home); *King*, 563 U.S. at ___, 131 S. Ct. at 1854 (apartment building); *Fernandez v. California*, 571 U.S. ___, ___, 134 S. Ct. 1126, 1130 (2014) (apartment). A review of the Supreme Court's fourth amendment jurisprudence shows the Court often uses the generic term "home" when discussing the scope of the fourth amendment's protections. See *Kyllo*, 533 U.S. at 31 ("With few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no."); *Randolph*, 547 U.S. at 115 ("Since we hold to the 'centuries-old principle of respect for the privacy of the home,' *Wilson v. Layne*, 526 U.S. 603, 610 (1999), 'it is beyond dispute that the home is entitled to special protection as the center of the private lives of our people,' *Minnesota v. Carter*, 525 U.S. 83, 99 (1998) (Kennedy, J., concurring)."); *Fernandez*, 571 U.S. at ___, 134 S. Ct. at 1132 ("Our cases establish that a warrant is generally required for a search of a home ***."). See also *People v. McNeal*, 175 Ill. 2d 335, 344, 677 N.E.2d 841, 846 (1997) ("The physical entry of the home is the chief evil against which the fourth amendment is directed."). This can been seen in *Payton*, a case involving an apartment, where the Court stated "[i]t is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable" (*Payton*, 445 U.S. at 586) and announced the fourth amendment protects individuals in a variety of settings, but "[i]n none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home–a zone that finds its roots in clear and specific constitutional terms" (*id.* at 589).

¶ 42     In *Jardines*, the Court again referred to the generic "home" when it declared, "the home is first among equals" when it comes to the fourth amendment. *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1414. The reasoning behind the Court's use of a generic term when discussing the scope of the fourth amendment is obvious: homes come in different shapes, sizes, and forms. Some homes afford greater privacy from prying eyes (and noses) than others. One individual may live on a vast estate secluded from the public while another may live in a high-rise apartment building in the middle of a busy city. The fourth amendment protects both individuals' right " 'to retreat into his own home and there be free from unreasonable governmental intrusion.' " *Id.* at ___, 133 S. Ct. at 1414 (quoting *Silverman*, 365 U.S. at 511).

¶ 43     The fourth amendment protects more than the physical dimensions of a house–it also protects the area " 'immediately surrounding and associated with the home.' " *Id.* at ___, 133 S. Ct. at 1414 (quoting *Oliver*, 466 U.S. at 180). This area is referred to as the curtilage. The

boundaries of the curtilage are easily understood from daily experience and include all the home's physical branches. *Id.* at ___, 133 S. Ct. at 1415 (quoting *Oliver*, 466 U.S. at 182 n.12). This court specifically requested the State to analyze this case using *Jardines*' property-based rationale, *i.e.*, elaborate on its assertion there was no invasion of the curtilage. The State persisted in its argument there was no violation of defendant's property rights and asserted "it is well established that apartment dwellers have no reasonable expectation of privacy as to the common areas of the apartment building."

¶ 44 This is not the appropriate analysis for determining whether the police conduct has occurred within the curtilage. See *United States v. Dunn*, 480 U.S. 294, 301 (1987) (providing four factors to consider when analyzing whether a particular area is part of the curtilage). In *Jardines*, there was no question the officers entered the curtilage because the front porch is a "classic exemplar" of the curtilage. *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1415. Defendant does not have a front porch outside her apartment door. She has a landing. This distinction is unimportant and we need not decide whether this landing is included within defendant's apartment's curtilage. Compare *McClintock*, 405 S.W.3d at 284 (concluding the landing outside the apartment's front door was part of the curtilage), and *State v. Nguyen*, 2013 ND 252, ¶ 13, 841 N.W.2d 676 (concluding a common hallway was not within the curtilage). The answer is much simpler. The plain holding of *Jardines* applies to "[t]he government's use of trained police dogs to investigate the home and its immediate surroundings." *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1417-18. A home's front door is part of the "home and its immediate surroundings." See *Payton*, 445 U.S. at 590 (stating the fourth amendment has "drawn a firm line at the entrance to the house," one which cannot be reasonably crossed without a warrant); *United States v. Santana*, 427 U.S. 38, 42 (1976) ("under the common law of property the threshold of one's dwelling is 'private' ").

¶ 45 In *Jardines*, the Court noted an individual's right to retreat within his or her home would have "little practical value" if the police "could stand in a home's porch or side garden and trawl for evidence with impunity" and this right "would be significantly diminished if the police could enter a man's property to observe his repose from just outside the front window." *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1414. It reasons that if the police cannot stand outside the front window and trawl for evidence about the contents of the home, then they cannot stand immediately outside the front door and do the same thing. When the police stood at the entrance to defendant's apartment with a drug-detection dog, their investigation took place in a constitutionally protected area. Further supporting this conclusion is the fact the entrances to defendant's apartment building were locked every time the police attempted to enter defendant's apartment building and the officers were admitted by a resident or another officer. The entrance to defendant's home was not located on a public thoroughfare but rather behind a locked door. This is not a circumstance where the police and drug-detection dog were walking down a public sidewalk or corridor and the dog alerted to the presence of drugs. See *id.* at ___, 133 S. Ct. at 1426 (Alito, J., dissenting, joined by Roberts, C.J., and Kennedy and Breyer, JJ.). The question now turns to whether the police could have approached defendant's front door with a drug-detection dog at 3:20 a.m.

¶ 46 In *Jardines*, the Supreme Court noted there is an implicit invitation for a "visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Id.* at ___, 133 S. Ct. at 1415 (majority opinion). There is no customary invitation for someone–including a police officer–to "march[ ] his

bloodhound" up to someone's home to "engage in canine forensic investigation" and use a drug-detection dog "to explore the area around the home in hopes of discovering incriminating evidence." *Id.* at ___, 133 S. Ct. at 1416. Nor is there an implicit invitation for "a visitor [to] come to the front door in the middle of the night." *Id.* at ___, 133 S. Ct. at 1422 (Alito, J., dissenting, joined by Roberts, C.J., and Kennedy and Breyer, JJ.); *id.* at ___ n.3, 133 S. Ct. at 1416 n.3 (majority opinion, agreeing). In this case, the police not only approached defendant's front door with a drug-detection dog to engage in an investigation of her home, they did so in the middle of the night. As *Jardines* makes clear, there is no implicit invitation for the police to do this and the officers in this case could not approach defendant's front door, absent a warrant, with a drug-detection dog to conduct a search of the contents her home.

¶ 47      3. *The State's Argument Defendant Did Not Have a Reasonable Expectation of Privacy in the Apartment Building's Common Areas*

¶ 48      The State argues *Jardines* does not apply because defendant could not have a reasonable expectation of privacy in her apartment building's common areas. It contends *Jardines* "clearly demonstrated" the reasonable-expectation-of-privacy test from *Katz* is to be used in determining the "propriety of police conduct in approaching an individual's home." As discussed above, *Jardines* reiterated *Katz*'s reasonable-expectation-of-privacy test *adds* to the fourth amendment's property-based protections, it does not subtract from those protections.

¶ 49      In this case, defendant argues the use of a drug-detection dog to sniff her front door violated the fourth amendment as held in *Jardines*. We have used the property-based analysis used in *Jardines* to resolve this case. We need not consider whether defendant had a reasonable expectation of privacy in the common areas of the apartment building because this question is "unnecessary to consider when the government gains evidence by physically intruding on constitutionally protected areas." *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1417.

¶ 50      E. Does *Jardines* Require Suppression?

¶ 51      The State concedes *Jardines* applies retroactively to defendant's case as it was not yet final at the time *Jardines* was decided (see *Griffith*, 479 U.S. at 328), but argues suppression of the evidence recovered pursuant to the search warrant is not required. The State asserts the good-faith exception to the exclusionary rule applies because the police acted in good-faith reliance upon established law existing at the time of the search. It also argues the evidence seized pursuant to the search warrant may still be admitted because the lawfully obtained information in the warrant application amounted to probable cause.

¶ 52      1. *The Exclusionary Rule, Generally*

¶ 53      Under the exclusionary rule, courts will generally not admit evidence obtained in violation of the fourth amendment. *People v. Sutherland*, 223 Ill. 2d 187, 227, 860 N.E.2d 178, 208 (2006). Under the fruit-of-the-poisonous-tree doctrine, which is an outgrowth of the exclusionary rule, "the fourth amendment violation is deemed the 'poisonous tree,' and any evidence obtained by exploiting that violation is subject to suppression as the 'fruit' of that poisonous tree." *People v. Henderson*, 2013 IL 114040, ¶ 33, 989 N.E.2d 192.

¶ 54 "[T]he 'prime purpose' of the exclusionary rule 'is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures.' " *Illinois v. Krull*, 480 U.S. 340, 347 (1987).

¶ 55                              2. *The State's Good-Faith-Exception Argument*

¶ 56      The United States Supreme Court has recognized an exception to the exclusionary rule where the police acted with an objective, good-faith reliance on binding precedent. *Davis v. United States*, 564 U.S. ___, ___, 131 S. Ct. 2419, 2429 (2011). In *Davis*, the police officers, relying on binding federal precedent, conducted a search of the defendant's vehicle after he had been arrested. In *Arizona v. Gant*, 556 U.S. 332 (2009), a case decided after the vehicle search in *Davis*, the Supreme Court held such a search violated the fourth amendment. In *Davis*, the Court held "[a]n officer who conducts a search in reliance on binding appellate precedent does no more than ' "ac[t] as a reasonable officer would and should act" ' under the circumstances." *Davis*, 564 U.S. at ___, 131 S. Ct. at 2429 (quoting *United States v. Leon*, 468 U.S. 897, 920 (1984), quoting *Stone v. Powell*, 428 U.S. 465, 539-40 (1976) (White, J., dissenting)).

¶ 57      The State relies on *United States v. Place*, 462 U.S. 696 (1983), and *Illinois v. Caballes*, 543 U.S. 405 (2005), to assert the "general rule" at the time of the search was "the use of a sniffer dog did not constitute a search and did not invade privacy interests of the subject of the search." In *Place*, the Supreme Court held the use of a drug-detection dog to sniff an individual's luggage at an airport was not a search within the meaning of the fourth amendment. *Place*, 462 U.S. at 707. In *Caballes*, the Supreme Court considered the use of a drug-detection dog during a traffic stop and held "the use of a well-trained narcotics-detection dog–one that 'does not expose noncontraband items that otherwise would remain hidden from public view,' [citation]–during a lawful traffic stop, generally does not implicate legitimate privacy interests." *Caballes*, 543 U.S. at 409 (quoting *Place*, 462 U.S. at 707). *Place* and *Caballes* are distinguishable as those cases did not involve the use of a drug-detection dog to sniff a home. As discussed in *Jardines*, the use of a drug-detection dog to sniff a home in the hopes of discovering incriminating evidence presents a very different issue. *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1416. Further, *Place* and *Caballes* did not specifically authorize the officers' conduct. See generally *United States v. Reilly*, 76 F.3d 1271, 1280 (2d Cir. 1996) ("Good faith is not a magic lamp for police officers to rub whenever they find themselves in trouble.").

¶ 58      The State also relies on *Smith* and *Lyles* to assert Illinois precedent established "an individual did not have any expectation of privacy to common areas of an apartment building." We do not read *Smith* for the broad proposition an individual does not have *any* expectation of privacy in the common areas of an apartment building. In *Smith*, the police officers went to the defendant's apartment building, opened the building's *unlocked* rear door, and walked to a common-area hallway. *People v. Smith*, 152 Ill. 2d 229, 243, 604 N.E.2d 858, 863 (1992). While standing in the hallway, the officers overheard a conversation relating to a murder they were investigating. *Id.* Our supreme court held the officers' overhearing the conversation did not constitute a search under the fourth amendment. *Id.* at 245-46, 604 N.E.2d at 864. Again, *Smith* did not involve the use of a drug-detection dog to sniff an individual's front door but rather concerned an individual's *reasonable* expectation of privacy in things *overheard* by the

police while standing in a common area. As discussed above, *Lyles*, which is not binding in the Fourth District, did not involve the use of a drug-detection dog.

¶ 59 This court's decision in *Trull* was binding appellate precedent relating to the officer's conduct. In *Trull*, this court "discern[ed] a marked difference between an individual's expectation of privacy in a locked apartment building as compared to an unlocked one" and held the fourth amendment protected against the police's entry into an apartment building's common hallways. *Trull*, 64 Ill. App. 3d at 389, 380 N.E.2d at 1173. It is undisputed defendant's apartment building was locked and the officer with the drug-detection dog was admitted by another police officer. This conduct was not authorized by *Trull*.

¶ 60 As there was no *binding* appellate precedent specifically authorizing the officers' conduct (see *Davis*, 564 U.S. at ___, 131 S. Ct. at 2429), the exception to the exclusionary rule announced in *Davis* is not applicable to this case.

¶ 61 *3. The State's Argument the Evidence Seized Pursuant to the Search Warrant Is Not Subject to the Exclusionary Rule*

¶ 62 The State argues the use of the drug-detection dog did not invalidate the search warrant as evidence seized pursuant to a search warrant may be admitted if, apart from the tainted information, the lawfully obtained information contained in the warrant amounted to probable cause. The State cites *People v. Free*, 94 Ill. 2d 378, 447 N.E.2d 218 (1983), in support of this proposition.

¶ 63 The search warrant in this case was tainted by the illegal police conduct–the warrantless use of a drug-detection dog to sniff defendant's apartment's front door at 3:20 a.m. The State would have us overlook this taint if the search warrant contained probable cause without the tainted information. The trial court here found if paragraphs 9 and 10 (the paragraphs regarding the dog sniff) were excised from the affidavit for a search warrant, the remaining facts pleaded were insufficient to establish probable cause for the issuance of the search warrant. We agree.

¶ 64 Absent the dog sniff, the evidence relied upon in the complaint and affidavit for a search warrant is scanty at best. We cannot determine from the record the specific time on January 10 when Mecum observed a package addressed to defendant with a return address shipping label from an individual in California. Facebook pages showing images favoring the legalization of marijuana and images of marijuana and currency coupled with defendant's prior police contacts for possession are not sufficient to establish probable cause for a search warrant of defendant's home.

¶ 65 We conclude the warrantless use of a drug-detection dog to sniff defendant's apartment door at 3:20 a.m. affected the judge's decision to issue the search warrant, and the evidence obtained pursuant to the search warrant is fruit of the poisonous tree and the exclusionary rule applies.

¶ 66                                    III. CONCLUSION
¶ 67 The trial court's judgment is affirmed.

¶ 68 Affirmed.