

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

## NOS. PD-0013-15 & PD-0015-15

### THE STATE OF TEXAS

**v.**

### MICHAEL ERIC RENDON, Appellee

### ON STATE'S PETITION FOR DISCRETIONARY REVIEW FROM THE THIRTEENTH COURT OF APPEALS VICTORIA COUNTY

**RICHARDSON, J., filed a concurring opinion.**

### CONCURRING OPINION

To decide this case under *Florida v. Jardines*,[1] we have to decide if there has been a physical intrusion on Rendon's property. I agree with the majority that this can be done under the facts of this case because Detective Stover led Baco up the stairs of Rendon's apartment building and across the landing *directly* to Rendon's apartment door,[2] where Baco

---

[1] No. 11-564, 133 S. Ct. 1409 (Mar. 26, 2013).

[2] Detective Stover testified at the motion to suppress hearing that he "deployed Canine Baco on the exterior of the apartment," and that the dog "indicated a positive alert on the exterior of the

sniffed at the door and its threshold, then alerted Detective Stover to the presence of narcotics inside the apartment.[3]  Consistently with the reasoning of *Jardines*, the majority rightly concludes that law enforcement officers invaded the curtilage of Rendon's apartment because they brought a trained drug-detection dog directly up to the front door of an apartment-home for the purpose of conducting a canine-narcotics sniff.  An apartment should be afforded some curtilage that carries with it the same property-based protections under *Jardines* as the curtilage of a house.  I also agree that, if we can decide this case under *Jardines* by holding that the officers physically intruded into the curtilage of Rendon's apartment, there is no need to analyze whether the officers' conduct violated Rendon's reasonable expectation of privacy under *Katz.*  Every apartment, every home, has a front door threshold.  And, while the Supreme Court has generally "eschewed bright-line rules"[4] in the Fourth Amendment context, the Supreme Court has drawn "a firm line at the entrance to the house."[5]  The front door threshold of an apartment qualifies as a "classic exemplar of an area

---

door."  John Crook, another tenant, also testified at the hearing.  Crook lives in a unit directly across the driveway from Rendon's apartment.  Crook testified that he observed the drug-detection dog go up the stairs to Rendon's front door and sniff at the door for "a couple of minutes."

[3] According to Detective Stover's search warrant affidavit, he "deployed K-9 Baco on the front door of the residence.  K-9 Baco displayed a change in behavior and breathing at the bottom left portion of the front door seem [*sic*] indicating the positive alert to the odor of illegal narcotics from within."  The sole basis for the warrant to search Rendon's apartment was the dog sniff of the apartment door.

[4] *Ohio v. Robinette*, 519 U.S. 33, 39 (1996).

[5] *Payton v. New York*, 445 U.S. 573, 590 (1980) (stating the Fourth Amendment has "drawn a firm line at the entrance to the house," one which cannot be reasonably crossed without a warrant);

adjacent to the home," and could not reasonably be interpreted as a common area shared by other apartment residents. I agree, therefore, that an apartment's threshold and front door are part of the apartment and thus constitute its curtilage—property "immediately surrounding and associated with"[6] the apartment. When Detective Stover led Baco directly to Rendon's front door threshold to sniff for drugs, the police investigation took place in a constitutionally protected area.

When discussing the scope of the Fourth Amendment's protections, the Supreme Court does not differentiate between the types of residences and whether they are owned or rented. A home is a home, whether it is a single-family dwelling, or a condominium, a duplex, or an apartment in a high-rise building, multi-unit complex, or public housing.[7] The court in *People v. Burn*s expressed it well:

> The reasoning behind the Court's use of a generic term when discussing the scope of the fourth amendment is obvious: homes come in different shapes, sizes, and forms. Some homes afford greater privacy from prying eyes (and noses) than others. One individual may live on a vast estate secluded from the public while another may live in a high-rise apartment building in the middle of a busy city. The fourth amendment protects both individuals' right "to

---

*United States v. Santana*, 427 U.S. 38, 42 (1976) ("under the common law of property the threshold of one's dwelling is private").

[6] *Jardines*, 133 S.Ct. at 1414.

[7] *See Minnesota v. Carter*, 525 U.S. 83, 99 (1998) (Kennedy, J., concurring) ("[I]t is beyond dispute that the home is entitled to special protection as the center of the private lives of our people.").

retreat into his own home and there be free from unreasonable governmental intrusion."[8]

And, although it is not necessary to decide today whether the officers violated Rendon's expectation of privacy under *Katz* by bringing Baco directly up to the front-door threshold to conduct a dog sniff, I write separately to call attention to Justice Kagan's discussion of *Kyllo v. United States*[9] in her concurring opinion in *Jardines*. Justice Kagan noted that the use of a drug-detection dog to investigate the contents of a home is no less a "sense-enhancing technology" that is not in general public use than was the thermal-imaging device in *Kyllo v. United States*.[10] In *Kyllo*, the Supreme Court held that "obtaining by sense-enhancing technology any information regarding the interior of the home that could not otherwise have been obtained without physical 'intrusion into a constitutionally protected area,' constitutes a search—at least where (as here) the technology in question [a drug-detection dog] is not in general public use."[11] In this case, the police were using Baco to sniff Rendon's front door in order to discern if there were narcotics inside Rendon's apartment. The sniff at Rendon's front door intruded on the privacy expectations Rendon had *inside his home*. Even if one could argue that the dog was sniffing odors that were outside of the

---

[8] 25 N.E.3d 1244, 1252 (Ill. App. 4th Dist. 2015) (quoting *Jardines*, 133 S. Ct. at 1414 (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961))).

[9] 533 U.S. 27 (2001).

[10] *Jardines*, 133 S. Ct. at 1419-20 (Kagan, J., concurring).

[11] *Kyllo*, 533 U.S. at 34 (quoting *Silverman v. United States*, 365 U.S. 505, 512 (1961)).

apartment and thus not within the privacy of Rendon's home, a dog's olfactory senses, being so much stronger than a human's, would render that reasoning inapplicable. In fact, dogs have been known to detect certain types of cancers in humans using their sense of smell.[12] A method of surveillance by which the government uses a device (such as a specially trained drug-detection dog) that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion, could be considered a search under the reasoning of *Kyllo.*

With these comments, I join the majority.

FILED: December 16, 2015
PUBLISH

---

[12] *See* Gianluigi Taverna, et al., *Olfactory System of Highly Trained Dogs Detects Prostate Cancer in Urine Samples*, 193 J. OF UROLOGY 1392 (Apr. 2015) *available at* http://www.sciencedirect.com/science/article/pii/S002253471404573X. *See also* Meredith Cohn, *Woman Credits Search/Rescue Dog with Detecting Her Lung Cancer*, SAN ANTONIO EXPRESS NEWS, Dec. 8, 2015, at D1(reprinting from Meredith Cohn, *Heidi the Dog's Sniffing Leads to Owner's Cancer Diagnosis*, BALTIMORE SUN (Nov. 29, 2015, 7:36 PM)*,* http://www.baltimoresun.com/health/bs-hs-dogs-sniff-disease-20151118-story.html.).