The STATE of Texas

v.

Michael Eric RENDON, Appellee

NOS. PD–0013–15 & PD–0015–15

Court of Criminal Appeals of Texas.

FILED: December 16, 2015

two, any distinction between these two words would become superfluous.").

806

Brendan Wyatt Guy, for The State of Texas.

1. 133 S.Ct. 1409 (2013).

Edward F. Shaughnessy III, for Michael Eric Rendon.

ALCALA, J., delivered the opinion of the Court in which MEYERS, JOHNSON, RICHARDSON, and NEWELL, JJ., joined.

In this case, we are asked to decide whether it constitutes a search within the meaning of the Fourth Amendment for law-enforcement officers to bring a trained drug-detection dog directly up to the front door of an apartment-home for the purpose of conducting a canine-narcotics sniff. We hold that it does. Consistent with the reasoning of the Supreme Court's opinion in *Florida v. Jardines*,[1] we conclude that the officers' use of a dog sniff at the front door of the apartment-home of Michael Eric Rendon, appellee, resulted in a physical intrusion into the curtilage that exceeded the scope of any express or implied license, thereby constituting a warrantless search in violation of the Fourth Amendment. We, therefore, affirm the judgment of the court of appeals, which had affirmed the trial court's rulings granting appellee's motions to suppress. *See State v. Rendon*, Nos. 13-13-00665-CR, 13-13-00666-CR, 2014 WL 6881630 (Tex.App.—Corpus Christi Dec. 4, 2014).

## I. Background

In 2012, law-enforcement officers in Victoria were investigating appellee on suspicion of drug activity. One day, several officers, including Victoria Police Detective Stover and his trained drug-detection dog, Baco, went to the apartment complex where appellee lived. The apartment complex had four units, with two units upstairs and two units downstairs. Appellee lived in one of the upstairs units, which were accessible by a single staircase leading up to a landing. The landing was for the two

upstairs units, with the door to each apartment on opposite ends of the landing. The stairs and landing had a metal fence that traversed the border, with the posts of the fence being multiple inches apart. Because the metal-fence posts were several inches apart, it would be possible to see the stairway and the door for each of the upstairs units even from the ground below.

When he first arrived, Detective Stover took Baco, his drug-detection dog, to the apartment complex's parking lot, where appellee's car was parked. Baco, who walked around the exterior of appellee's car, exhibited a positive alert to the smell of illegal narcotics. Detective Stover then walked Baco up the stairs to appellee's front door. Baco again alerted to the odor of illegal narcotics. Later that day, relying on the information obtained through the dog sniff, Detective Stover applied for a search warrant for appellee's vehicle and apartment. In his search-warrant affidavit, Detective Stover noted that Baco had alerted to the presence of an odor of illegal narcotics both on appellee's vehicle and on the "bottom left portion" of appellee's front door. Specifically, the affidavit stated,

> I deployed K–9 Baco on the front door of the residence. K–9 Baco displayed a change in behavior and breathing at the seem [sic] indicating the positive alert to the odor of illegal narcotics from within. K–9 Baco also indicated a final taught response to the odor of narcotics from within by sitting.

A judge signed the search warrant and officers executed it, seizing about two pounds of marijuana and $4,904 in cash, for which appellee was indicted for possession of marijuana and money laundering in two cause numbers.[2] Appellee filed a motion to suppress in each case. At the hearing on his motions, appellee asserted that the warrant to search his apartment was invalid on the basis that the information used to establish probable cause—Baco's positive alert to the presence of narcotics at his front door—had been obtained through an unlawful search in violation of the Fourth Amendment.

At the suppression hearing, Detective Stover testified consistently with his search-warrant's affidavit's description of the search as having occurred at the bottom left portion of the front door by stating that he "deployed Canine Baco on the exterior of the apartment," and Baco "indicated a positive alert on the exterior of the door[.]" The trial court granted appellee's motions to suppress the evidence obtained from the search of his apartment. In its findings of fact and conclusions of law, the trial court found that appellee's apartment "was located on the 2 nd floor of the apartment building and was the only apartment to the left of the stairs (another apartment was to the right of the stairs)." The court reasoned that, although the stairs leading to the second floor were a "public or common area," the landing to the left of the top of the stairs "led only and directly to defendant's door, [and] was therefore part of the 'curtilage' of defendant's apartment[.]" The trial court determined that Baco's alert on the front door of appellee's apartment constituted an intrusion into the "curtilage" and that such intrusion constituted an unlawful search in violation of the Fourth Amendment. After excluding the unlawfully obtained information, the trial court ruled that the remaining information in the search-warrant affidavit was inadequate to establish probable cause to support the issuance of the search warrant.

The State appealed. On appeal, the court of appeals upheld the trial court's rulings suppressing the evidence. *See*

---

**2.** Tex. Health & Safety Code § 481.121; Tex. Penal Code § 34.02(e)(1).

*Rendon*, 2014 WL 6881630, at *4. The court of appeals agreed with appellee's contention that Baco's "sniff search occurred in the curtilage of [appellee's] apartment, and was, thus, unreasonable under [*Florida v.*] *Jardines* and the Fourth Amendment." *Id.* at *3 (citing 133 S.Ct. 1409 (2013)). Thus, "bringing a trained police dog to sniff the bottom left portion of [appellee's] apartment door in hopes of discovering incriminating evidence exceeded the scope of any express or implied license allowed under the Fourth Amendment." *Id.* at *4 (citing *Jardines*, 133 S.Ct. at 1416). After setting aside the information derived from the unlawful dog sniff, the court upheld the trial court's determination that the remaining information in the search-warrant affidavit was inadequate to establish probable cause, and it held that the search warrant was invalid. *Id.* at *5.

We granted the State's petition for discretionary review to determine whether the court of appeals correctly concluded that the area outside appellee's front door constituted the curtilage of his apartment.[3]

## II. The Physical–Intrusion Theory in *Jardines* Applies to this Case

Although our holding is more limited than the court of appeals's conclusion, we agree with the court of appeals that the reasoning of *Jardines* applies to this case. *See Jardines*, 133 S.Ct. at 1414–17. As we explain more fully below, we hold that the officers' conduct in bringing a trained drug-detection dog up to the threshold or area immediately outside of appellee's front door for the purpose of conducting a canine-narcotics sniff was an "unlicensed physical intrusion" onto the curtilage of his home that constituted a search in violation of the Fourth Amendment. *See id.* at 1415. Because the facts here show that the dog sniff occurred at the threshold of appellee's apartment-home and thus was clearly included within the physical-intrusion theory of *Jardines*, we need not reach the broader holding of the court of appeals that the portion of the landing to the left of the top of the stairs leading to appellee's door was the curtilage of his apartment and also subject to *Jardines*'s physical-intrusion theory. *See id.*; *Rendon*, 2014 WL 6881630, at *4 (concluding that "the area immediately in front of Rendon's apartment is no different from the front porch of a free-standing home," and, therefore, bringing a trained drug-detection dog to that location exceeded the scope of any express or implied license and thus constituted a search for Fourth Amendment purposes).

The Fourth Amendment provides in relevant part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. IV. In *Jardines*, the Supreme Court explained that this text "establishes a simple baseline." *Jardines*, 133 S.Ct. at 1414. Namely, the Court indicated that, when " 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a search within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.' " *Id.* (quoting *United States v. Jones*, 565 U.S. ——, 132 S.Ct. 945, 950–51, n. 3 (2012)). In particular, with respect to the special constitutional protections that attach to the home, the Court observed that,

---

**3.** The State's ground for review states,
The Court of Appeals['s] finding that the area outside of Appellee's apartment constituted the curtilage of that apartment incorrectly decided an important question of State and Federal law that has not been but should be settled by the Court of Criminal Appeals.

when it comes to the Fourth Amendment, the home is first among equals. At the Amendment's "very core" stands "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." This right would be of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity; the right to retreat would be significantly diminished if the police could enter a man's property to observe his repose from just outside the front window.

*Id.* (quoting *Silverman v. United States,* 365 U.S. 505, 511 (1961)).

Applying these principles in *Jardines,* the Supreme Court considered whether it would constitute a search within the meaning of the Fourth Amendment for law-enforcement officers to use a drug-sniffing dog on the porch of a single-family residence to investigate the contents of the home. *Id.* at 1413. Comparing the physical intrusion into the curtilage of the home to the placement of a GPS receiver that had been physically mounted to a defendant's automobile, the *Jardines* Court applied the "traditional property-based understanding of the Fourth Amendment" to hold that the intrusion onto Jardines's porch was unauthorized. *See id.* at 1417 (citing *Jones,* 132 S.Ct. at 950). The *Jardines* Court discussed a physical intrusion that had occurred as a result of the entry by the officers and their drug-detection dog into the curtilage, which it defined as the area "'immediately surrounding and associated with the home'" that is considered to be a "'part of the home itself for Fourth Amendment purposes.'" *Id.* at 1414 (quoting *Oliver v. United States,* 466 U.S. 170, 180 (1984)). The *Jardines* Court stated,

The officers were gathering information in an area belonging to Jardines and immediately surrounding his house—in the curtilage of the house, which [the Supreme Court] ha[d] held enjoys protection as part of the home itself. And they gathered that information by physically entering and occupying the area to engage in conduct not explicitly or implicitly permitted by the homeowner.

*Id.* The Court further described the curtilage as the area around the home that is "'intimately linked to the home, both physically and psychologically,'" and is where "'privacy expectations are most heightened.'" *Id.* at 1415 (quoting *California v. Ciraolo,* 476 U.S. 207, 213 (1986)). The Court discussed the fact that, although the boundaries of the curtilage are generally "'clearly marked,'" the 'conception defining the curtilage' is at any rate familiar enough that it is 'easily understood from our daily experience.'" *Id.* (quoting *Oliver,* 466 U.S. at 182 n. 12). In *Jardines,* where the search occurred on the front porch of a private house, the Court easily resolved the matter of whether that area was included within the curtilage, stating that "there is no doubt that the officers entered [the curtilage]: The front porch is the classic exemplar of an area adjacent to the home and 'to which the activity of home life extends.'" *Id.*

Having determined that the officers' investigation took place in a constitutionally protected area, the Court turned to the question of whether it was accomplished through an unlicensed physical intrusion. *Id.* Noting that physical entry onto the curtilage of a home is permitted by most residents under an implied-license theory, the Court explained that the kind of physical intrusion in *Jardines*—placing a dog with specialized skills on the person's porch for the purpose of detecting illicit drug activity—exceeded the scope of any express or implied license generally limited to knocking on a person's front door.

*Id.* at 1416 (explaining that "[t]he scope of a license—express or implied—is limited not only to a particular area but also to a specific purpose.... Here, the background social norms that invite a visitor to the front door do not invite him there to conduct a search."). The Court concluded that the fact that "the officers learned what they learned only by physically intruding on Jardines' property to gather evidence is enough to establish that a search occurred." *Id.* at 1417. Thus, the holding of *Jardines* was that, by physically intruding onto the front porch of a single-family dwelling with a specialized drug-detection dog for the express purpose of conducting a narcotics investigation, the officers exceeded the scope of their implied invitation that was limited to knocking on the front door. *Id.* at 1416–17.

The *Jardines* Court noted that "[o]ne virtue of the Fourth Amendment's property-rights baseline is that it keeps easy cases easy." *Id.* at 1417. Similarly, under these facts that show that the dog sniff occurred at the threshold of appellee's apartment-home, we conclude that application of the property-rights baseline renders the present case a straightforward one. Here, the officers took a drug-detection dog directly up to the threshold of appellee's front door, at which point the dog alerted to the presence of illegal narcotics on the bottom left portion of the door. This threshold at the door of an apartment-home located at an upstairs landing that served only two apartments is objectively " 'intimately linked to the home, both physically and psychological-

ly,' " and thus was part of the curtilage. *See id.* at 1415 (quoting *Ciraolo*, 476 U.S. at 213).[4] The officers' presence at that location was for the express purpose of conducting a search for illegal narcotics, which exceeded the scope of any express or implied license that is generally limited to knocking on someone's door. *Id.* at 1416–17. Under a strict application of the "traditional property-based understanding of the Fourth Amendment," we conclude that the dog sniff at the threshold of appellee's apartment's door was an unlawful search within the meaning of the Fourth Amendment. *Id.* at 1417 (citing *Jones*, 132 S.Ct. at 951–52); *see also United States v. Burston*, 806 F.3d 1123, 1127–28, 2015 WL 7454379, at *3–4 (8th Cir.Nov. 23, 2015) (in analogous situation, applying *Jardines* and concluding that use of drug-sniffing dog six to ten inches from apartment window constituted intrusion upon curtilage; that area was "immediately surrounding [the defendant's] residence," and thus, in the absence of any license to invade defendant's curtilage for that purpose, the "dog sniff was an illegal search" in violation of defendant's Fourth Amendment rights). We, therefore, narrowly hold that the curtilage extended to appellee's front-door threshold located in a semi-private upstairs landing and that the officers' conduct in bringing a trained narcotics-detection dog into that constitutionally protected area constituted an unlicensed physical intrusion in violation of the Fourth Amendment. *See Jardines*, 133 S.Ct. at 1417–18. We accordingly uphold the judgment of the court of appeals af-

---

4. *See also United States v. Dunn*, 480 U.S. 294, 301, 303 (1987) (explaining that the "centrally relevant consideration" in determining whether area constitutes curtilage is whether that area is "so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection"; primary focus is on whether the area is "so associated with the activities and privacies of domestic life" that it is deemed "part of" the home); *Oliver v. United States*, 466 U.S. 170, 182 n.12 (1984) (describing the "conception defining the curtilage ... as the area around the home to which the activity of home life extends").

firming the trial court's suppression order. *See Rendon,* 2014 WL 6881630, at *4.

As was the case in *Jardines,* given our conclusion that the officers physically intruded into the curtilage of appellee's home for the purpose of gathering evidence, we need not decide whether the officers' conduct in this case also violated his expectation of privacy, which might be an alternative basis for upholding the judgment of the court of appeals. *See Jardines,* 133 S.Ct. at 1414, 1417 (citing *Katz v. United States,* 389 U.S. 347 (1967), and explaining that, given the officers' physical intrusion on a constitutionally protected area, the Court "need not decide whether the officers' investigation of Jardines' home violated his expectation of privacy under *Katz* "; "though *Katz* may add to the baseline, it does not subtract anything from the Amendment's protections when the Government *does* engage in [a] physical intrusion of a constitutionally protected area") (citations and quotation marks omitted). Furthermore, we do not reach the question whether the immediate area beyond the threshold of the door of an apartment-home, such as a private or semi-private landing or porch to an apartment may be considered part of the curtilage of the home, although we note that courts have determined that the "common areas" of an apartment complex are outside the curtilage. *See, e.g., Evans v. State,* 995 S.W.2d 284, 286 (Tex.App.—Houston [14th Dist.] 1999) (distinguishing between defendant's apartment and the "common areas of the apartment complex," and observing that "[c]learly, the common areas [the defendant] complains of were not the curtilage of her apartment"); *United States v. Diehl,* 276 F.3d 32, 39 (1st

Cir.2002) (observing that, "[i]n a modern urban multifamily apartment house, the area within the 'curtilage' is necessarily much more limited than in the case of a rural dwelling subject to one owner's control") (citing *United States v. Arboleda,* 633 F.2d 985, 992 (2d Cir.1980)). We leave these more difficult questions for another day.

## III. Conclusion

Applying the Supreme Court's reasoning in *Jardines* to the facts of this case, we conclude that, by bringing a drug-detection dog directly up to appellee's front door for the purpose of conducting a canine-narcotics sniff, the officers physically intruded upon the curtilage of appellee's home in a manner that exceeded the scope of any express or implied license, and any evidence obtained as a result of that trespass was obtained in violation of the Fourth Amendment. We, therefore, affirm the judgment of the court of appeals.

RICHARDSON, J., filed a concurring opinion. YEARY, J., filed a dissenting opinion in which KELLER, P.J., KEASLER, and HERVEY, JJ., joined.

RICHARDSON, J., filed a concurring opinion.

To decide this case under *Florida v. Jardines,*[1] we have to decide if there has been a physical intrusion on Rendon's property. I agree with the majority that this can be done under the facts of this case because Detective Stover led Baco up the stairs of Rendon's apartment building and across the landing *directly* to Rendon's apartment door,[2] where Baco sniffed

---

1. No. 11–564, 133 S.Ct. 1409 (Mar. 26, 2013).

2. Detective Stover testified at the motion to suppress hearing that he "deployed Canine Baco on the exterior of the apartment," and

that the dog "indicated a positive alert on the exterior of the door." John Crook, another tenant, also testified at the hearing. Crook lives in a unit directly across the driveway from Rendon's apartment. Crook testified

at the door and its threshold, then alerted Detective Stover to the presence of narcotics inside the apartment.[3] Consistently with the reasoning of *Jardines*, the majority rightly concludes that law enforcement officers invaded the curtilage of Rendon's apartment because they brought a trained drug-detection dog directly up to the front door of an apartment-home for the purpose of conducting a canine-narcotics sniff. An apartment should be afforded some curtilage that carries with it the same property-based protections under *Jardines* as the curtilage of a house. I also agree that, if we can decide this case under *Jardines* by holding that the officers physically intruded into the curtilage of Rendon's apartment, there is no need to analyze whether the officers' conduct violated Rendon's reasonable expectation of privacy under *Katz.* Every apartment, every home, has a front door threshold. And, while the Supreme Court has generally "eschewed bright-line rules"[4] in the Fourth Amendment context, the Supreme Court has drawn "a firm line at the entrance to the house."[5] The front door threshold of an apartment qualifies as a "classic exemplar of an area adjacent to the home," and could not reasonably be interpreted as a common area shared by other apartment residents. I agree, therefore, that an apartment's threshold and front door are

part of the apartment and thus constitute its curtilage—property "immediately surrounding and associated with"[6] the apartment. When Detective Stover led Baco directly to Rendon's front door threshold to sniff for drugs, the police investigation took place in a constitutionally protected area.

When discussing the scope of the Fourth Amendment's protections, the Supreme Court does not differentiate between the types of residences and whether they are owned or rented. A home is a home, whether it is a single-family dwelling, or a condominium, a duplex, or an apartment in a high-rise building, multi-unit complex, or public housing.[7] The court in *People v. Burns* expressed it well:

> The reasoning behind the Court's use of a generic term when discussing the scope of the fourth amendment is obvious: homes come in different shapes, sizes, and forms. Some homes afford greater privacy from prying eyes (and noses) than others. One individual may live on a vast estate secluded from the public while another may live in a high-rise apartment building in the middle of a busy city. The fourth amendment protects both individuals' right "to retreat into his own home and there be

---

that he observed the drug-detection dog go up the stairs to Rendon's front door and sniff at the door for "a couple of minutes."

3. According to Detective Stover's search warrant affidavit, he "deployed K–9 Baco on the front door of the residence. K–9 Baco displayed a change in behavior and breathing at the bottom left portion of the front door seem [*sic*] indicating the positive alert to the odor of illegal narcotics from within." The sole basis for the warrant to search Rendon's apartment was the dog sniff of the apartment door.

4. *Ohio v. Robinette,* 519 U.S. 33, 39 (1996).

5. *Payton v. New York,* 445 U.S. 573, 590 (1980) (stating the Fourth Amendment has "drawn a firm line at the entrance to the house," one which cannot be reasonably crossed without a warrant); *United States v. Santana,* 427 U.S. 38, 42 (1976) ("under the common law of property the threshold of one's dwelling is private").

6. *Jardines,* 133 S.Ct. at 1414.

7. *See Minnesota v. Carter,* 525 U.S. 83, 99 (1998) (Kennedy, J., concurring) ("[I]t is beyond dispute that the home is entitled to special protection as the center of the private lives of our people.").

free from unreasonable governmental intrusion." [8]

And, although it is not necessary to decide today whether the officers violated Rendon's expectation of privacy under *Katz* by bringing Baco directly up to the front-door threshold to conduct a dog sniff, I write separately to call attention to Justice Kagan's discussion of *Kyllo v. United States* [9] in her concurring opinion in *Jardines*. Justice Kagan noted that the use of a drug-detection dog to investigate the contents of a home is no less a "sense-enhancing technology" that is not in general public use than was the thermal-imaging device in *Kyllo v. United States*. [10] In *Kyllo*, the Supreme Court held that "obtaining by sense-enhancing technology any information regarding the interior of the home that could not otherwise have been obtained without physical 'intrusion into a constitutionally protected area,' constitutes a search—at least where (as here) the technology in question [a drug-detection dog] is not in general public use." [11] In this case, the police were using Baco to sniff Rendon's front door in order to discern if there were narcotics inside Rendon's apartment. The sniff at Rendon's front door intruded on the privacy expectations Rendon had *inside his home*. Even if one could argue that the dog was sniffing odors that were outside of the apartment and thus not within the privacy of Rendon's home, a dog's olfactory senses, being so much stronger than a human's, would render that reasoning inapplicable. In fact, dogs have been known to detect certain types of cancers in humans using their sense of smell. [12] A method of surveillance by which the government uses a device (such as a specially trained drug-detection dog) that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion, could be considered a search under the reasoning of *Kyllo*.

With these comments, I join the majority.

YEARY, J., filed a dissenting opinion in which KELLER, P.J., and KEASLER and HERVEY, JJ., joined.

In *Florida v. Jardines*, —— U.S. ——, 133 S.Ct. 1409, 185 L.Ed.2d 495 (2013), the United States Supreme Court held that a narcotics-dog sniff conducted on the front porch of a private residence constituted a search for Fourth Amendment purposes. In a published opinion, the Thirteenth Court of Appeals applied that holding to conclude that the trial court properly granted Appellee's motion to suppress in this case, in which the police conducted a dog sniff for drugs at the front door of Appellee's apartment. *State v. Rendon*, 476 S.W.3d 77 (Tex.App.–Corpus Christi

8. 25 N.E.3d 1244, 1252 (Ill.App. 4th Dist. 2015) (quoting *Jardines*, 133 S.Ct. at 1414 (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961))).

9. 533 U.S. 27 (2001).

10. *Jardines*, 133 S.Ct. at 1419–20 (Kagan, J., concurring).

11. *Kyllo*, 533 U.S. at 34 (quoting *Silverman v. United States*, 365 U.S. 505, 512 (1961)).

12. *See* Gianluigi Taverna, et al., *Olfactory System of Highly Trained Dogs Detects Prostate Cancer in Urine Samples*, 193 J. OF UROLOGY 1392 (Apr.2015) *available at* http://www.sciencedirect.com/science/article/pii/S002253471404573X. *See also* Meredith Cohn, *Woman Credits Search/Rescue Dog with Detecting Her Lung Cancer*, SAN ANTONIO EXPRESS NEWS, Dec. 8, 2015, at D1(reprinting from Meredith Cohn, *Heidi the Dog's Sniffing Leads to Owner's Cancer Diagnosis*, BALTIMORE SUN (Nov. 29, 2015, 7:36 PM), http://www.baltimoresun.com/health/bs-hs-dogs-sniff-disease-20151118-story.html.).

2015). The court of appeals agreed with the trial court that the short walkway leading exclusively from the top of an outdoor staircase to Appellee's front door constituted "curtilage" within the meaning of the Fourth Amendment.[1] I would reverse the judgment of the court of appeals. Because the Court does not, I dissent.

## BACKGROUND

Victoria narcotics detective Jason Stover was investigating Appellee on suspicion that he had been involved in the sale of cocaine to a confidential informant. Stover had been informed that Appellee was the scheduled driver of a business vehicle from which the sale had been conducted. On May 8, 2012, he proceeded with "Canine Baco," his trained drug-detection dog, to Appellee's residence at 901 Bingham, Apartment C. Baco first alerted to the presence of cocaine in the business vehicle, which was located in the parking lot of the apartment complex. Stover next led Baco to Appellee's apartment door. Stover described the layout as follows: "The apartment complex is a four-plex, two on the bottom, two on the top. The top have a common—one common staircase, up the middle, and splits off on a balcony, either left or right." Apartment C was the only apartment located to the left from the top of the staircase; there was no additional apartment farther down the walkway. Access to the doors of all the apartments was open to the public, with no "No Trespassing" signs posted. Testimony and photographs admitted at the hearing on Appellee's motion to suppress indicated that some of the residents of the complex kept patio furniture or plants along the walkway right outside their apartment doors, but Appellee himself did not.

Within "[a] couple of seconds" of climbing the stairs and arriving at the door of Apartment C along with Stover, Baco alerted to the presence of narcotics. Stover subsequently obtained a search warrant for the apartment. Based upon what this search revealed, Appellee was charged with possession of marijuana in an amount between four ounces and five pounds; he was also charged with money laundering.[2]

The trial court granted Appellee's motion to suppress. In its written order granting the motion to suppress, the trial court concluded that the dog sniff constituted an illegal search because it was conducted without a warrant while Stover and his narcotics dog were physically intruding upon the curtilage of Appellee's apartment.[3] For this proposition, the trial court relied upon the opinion of the First Court of Appeals in *McClintock v. State*, 405 S.W.3d 277 (Tex.App.–Houston [1st Dist.] 2013).[4] Excluding the information

---

1. *Id.* at 83 ("[W]e hold that police conducted an unreasonable search by using a trained police dog to investigate the curtilage of [Appellee's] apartment.").

2. As the court of appeals observed, "The record is unclear as to what exactly was seized from [Appellee's] . . . apartment following the execution of the search warrant." 476 S.W.3d at 80.

3. The trial court's order stated: "The landing to the left of the top of the stairs led only and directly to defendant's door, [and] was therefore part of the 'curtilage' of defendant's apartment and not part of a 'public or com-

mon area.' * * * Therefore, [the narcotic dog's] 'alert' was an illegal search within the meaning of the Fourth Amendment pursuant to *Florida v. Jardines,* —— U.S. ——, 133 S.Ct. 1409, 185 L.Ed.2d 495 (2013)."

4. McClintock lived in "a two-story brick duplex" in Houston. 405 S.W.3d at 281. The bottom story housed certain business premises and the top story was McClintock's apartment. *Id.* A stairway around the back of the building led up to what was apparently a single-unit dwelling—*not* a multi-dwelling complex. *Id.* The court of appeals determined that the landing at the top of the stairway constituted

gleaned from the drug-dog's sniff from Stover's affidavit in support of the warrant to search Appellee's apartment, the trial court found insufficient probable cause to justify issuance of the search warrant, and therefore concluded that any evidence obtained from the search was tainted.[5] The court of appeals agreed with the trial court's conclusion, reasoning that "[t]he present case does not deal with the common areas of an apartment complex ... such as parking lots and sidewalks, but rather the curtilage of [Appellee's] apartment." *State v. Rendon*, 476 S.W.3d at 83. We granted the State's petition for discretionary review to examine this holding.[6]

### STANDARD OF REVIEW

A reviewing court defers to the historical fact-findings and credibility determinations of the trial court, so long as those determinations find support in the record. *State v. Garcia–Cantu*, 253 S.W.3d 236, 241 (Tex.Crim.App.2008). But there is no factual dispute in this case. Nor is there any mixed question of law and fact that

turns on the credibility of a witness. The facts are uncontested and the only issue is the legal significance of those facts. Under these circumstances, I will review the question of whether the undisputed facts show that Detective Stover and Baco invaded the curtilage of Appellee's apartment—a mixed question of law and fact—de novo. *See Crain v. State*, 315 S.W.3d 43, 48 (Tex.Crim.App.2010) (reviewing courts review mixed questions of law and fact de novo unless they turn on an evaluation of credibility or demeanor); *State v. Sheppard*, 271 S.W.3d 281, 291 (Tex.Crim.App.2008) (whether particular facts satisfy ultimate legal standards "are legal conclusions subject to de novo review, not deference"); *Garcia–Cantu*, 253 S.W.3d at 241 ("[T]he question of whether a given set of historical facts amount[s] to a consensual police-citizen encounter or a detention under the Fourth Amendment is subject to de novo review because that is an issue of law—the application of legal principles to a specific set of facts.").

part of the apartment's curtilage. No different than a porch, the stairway landing attached to and surrounded the entrance to McClintock's home and the activity of home life extended onto it. McClintock kept several house plants on the landing. The stairway was not a 'common' area; it led only and directly to McClintock's door.
*Id.* at 284. This Court granted discretionary review in *McClintock*, but the scope of our review did not extend to the question of whether the top of the landing leading into the apartment constituted "curtilage" for purposes of the Fourth Amendment. *McClintock v. State*, 444 S.W.3d 15, 16 (Tex.Crim.App. 2014). The Court has no occasion today to express an opinion with respect to whether the particular facts of *McClintock* would demonstrate curtilage.

5. The trial court's order stated: "The 'drug dog alerting at the front door of the defendant's apartment' is then excluded from consideration in the search warrant affidavit. Considering the remaining information in the search warrant affidavit, the remaining infor-

mation does not establish probable cause to search the defendant's apartment."

6. In *Rivas v. State*, 411 S.W.3d 920 (Tex.Crim. App.2013), we remanded the case to the court of appeals for reconsideration of the question of whether a dog sniff conducted at the appellant's front door constituted a search in contemplation of the United States Supreme Court's then-recent opinion in *Jardines*. We did not indicate in our remand opinion whether the appellant's home was a house that he owned or an apartment that he rented. But even assuming that *Rivas* involved an apartment door, such a summary remand does not constitute a definitive resolution of the question for which the case is remanded, and *Rivas* does not control our disposition today. Were it otherwise, there would have been no point in our having granted the State's petition for discretionary review in this case, as we did in February of 2015—sixteen months after *Rivas*.

The facts of the instant case establish that Baco alerted to the presence of drugs from a position just outside the threshold of Appellee's apartment door. The door was not located in an enclosed hallway but was exposed to the out-of-doors for anyone to see. On the other hand, from the top of the stairs, the landing to the left led only to Appellee's door, not to any other apartment. Although some of the apartments in the complex had patio furniture and plants situated in the areas immediately surrounding their respective front doors, Appellee's did not. These facts are uncontested. I am left to decide the legal significance of these undisputed facts.

Was Stover encroaching upon the curtilage of Appellee's apartment at the time that Baco detected the presence of drugs, as the court of appeals concluded? If so, then the drug sniff constituted a warrantless search, the fruit of which should not have been considered by the magistrate who issued the subsequent warrant to search Appellee's apartment. If not, it is still necessary to decide whether the dog sniff nonetheless constituted a search—on the theory that Appellee's apartment is his "house" for Fourth Amendment purposes, and "[w]hen it comes to the Fourth Amendment, the home is first among equals." *Jardines*, 133 S.Ct. at 1414. I shall begin my analysis of this question with an examination of the concept of "curtilage" before *Jardines* was decided, and then I shall turn to *Jardines* itself to determine whether it has changed that concept. Finally, I ask whether there may have been a search in this case even in the absence of a physical invasion of the curtilage.

### ANALYSIS

#### Was the Curtilage Invaded?

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches ... shall not be violated[.]" U.S. CONST. amend. IV. "At the very core" of "the personal rights" that the Fourth Amendment "secures ... stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman v. United States*, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961). Because the sanctity of the home "would be of little practical .value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity[,]" the Fourth Amendment protection afforded to a person in his home extends also to "what [Supreme Court] cases call the curtilage[.]" *Jardines*, 133 S.Ct. at 1414. "[T]he curtilage is the area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life ... and therefore has been considered part of the home itself for Fourth Amendment purposes." *Oliver v. United States*, 466 U.S. 170, 180, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984) (internal quotation marks omitted). Courts "have defined the curtilage, as did the common law, by reference to the factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private." *Id.*

"While the boundaries of the curtilage are generally 'clearly marked,' the 'conception defining the curtilage' is at any rate familiar enough that it is 'easily understood from our daily experience.'" *Jardines*, 133 S.Ct. at 1415 (quoting *Oliver*, 466 U.S. at 182 n.12, 104 S.Ct. 1735). In *United States v. Dunn*, 480 U.S. 294, 301, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987), the Supreme Court gleaned four general factors from its own cases and lower court case law that it deemed "useful," though not exclusive, to "the task of defining the

extent of a home's curtilage[.]" These factors are:

the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.

*Id.* These factors were deemed "useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id.* Stated another way, "the primary focus is whether the area in question harbors those intimate activities associated with domestic life and the privacies of the home." Id. n.4.

It is, of course, beyond dispute that a residential apartment deserves protection as a "house" under the Fourth Amendment. *See Clinton v. Virginia,* 377 U.S. 158, 84 S.Ct. 1186, 12 L.Ed.2d 213 (1964) (summarily reversing the opinion of the Supreme Court of Appeals of Virginia in *Clinton v. Commonwealth,* 204 Va. 275, 282, 130 S.E.2d 437, 442 (1963), which had held that a listening device "stuck in" a party wall between two residential apartments did not constitute a Fourth Amendment violation). And there is likewise no doubt that an apartment—even an apartment in a multi-dwelling complex such as the one in this case—may carry with it a certain extent of curtilage, such as a partially enclosed patio, balcony, or patch of yard that is not open to use by other residents. The question here is whether the area immediately surrounding the front door of Appellee's apartment is sufficiently tied to the inherent privacy and intimate activities of the home as to merit

the same Fourth Amendment sanctity as a home.

Whether a particular apartment threshold may be regarded as curtilage will depend, of course, upon application of the *Dunn* factors to the facts of the case to determine the degree to which the intimate activities of the home are implicated. By and large, however, courts have fairly uniformly held that when the front door to an apartment or other "multi-occupancy dwelling" is exposed to general view rather than enclosed, and/or secured, from public access, the area around the front door does not enjoy the status of protected curtilage. *See* 1 Wayne R. LaFave, Search and Seizure: a Treatise on the Fourth Amendment § 2.3(c), at 759, 761–62 (5th ed.2012) ("[W]hat is different about the multiple-occupancy dwelling cases generally is that an occupant can claim an exclusive privacy interest in only a portion of the premises, and areas immediately adjacent to that portion will be open to public or common usage, so that courts are inclined to view those occupying such dwellings as having a reduced privacy expectation. * * * Apartment dwellers fare no better. It is not a search for an officer to look into an apartment while in a common passageway or other common area of the apartment complex[.]"); Carole A. Chase, *Cops, Canines, and Curtilage: What Jardines Teaches and What it Leaves Unanswered,* 52 Hous. L.Rev. 1289, 1305 (Spring 2015) ("In summary, the overwhelming weight of authority rejects the proposition that a resident of a multi-dwelling residential building can claim curtilage protection in common areas—or even anywhere outside an individual unit."). The more difficult cases involve apartment thresholds that open up into an enclosed hallway that is accessible to other residents and their guests but not necessarily to the public at large. Even then, a majority of courts have held that the area immediately

around the front door does not constitute curtilage—even when the common hallway is secured by lock and key from entry by the general public. *E.g., State v. Talley,* 307 S.W.3d 723, 732 (Tenn.2010) (identifying as the emerging "majority position among the states which have considered the question" that apartment and condominium dwellers have no reasonable expectation of privacy in common hallways even when they are secured against access by the general public); *State v. Nguyen,* 841 N.W.2d 676, 680–81 (N.D.2013) (same).[7]

Application of the *Dunn* factors to the instant case counsels against our holding that the area immediately surrounding Appellee's front door constitutes curtilage. There is no question that the proximity factor suggests curtilage; but that is the only factor that does. There was no enclosure surrounding Appellee's front door. It was open for any passerby directly to see, and Appellee took no steps (nor is there any showing that, by the terms of his lease, he would have been permitted to take steps) to obscure the public view. And, while there was evidence that some of Appellee's neighbors took advantage of the walkways immediately proximate to *their* front doors—apparently regarding that space as available for some limited measure of domestic intimacy (if not exactly privacy)—Appellee himself did not. The court of appeals placed some emphasis on the fact that the walkway from the left of the top of the stairs led only to Appellee's apartment, and no other. *Rendon,* 476 S.W.3d at 83. But this fact, while not wholly irrelevant, does not ultimately change the calculus. The walkway remained fully available to public view and public access, and, all other *Dunn* factors being considered, the fact that it led only to Appellee's threshold does not establish the degree of intimate use and privacy necessary to equate it with the home. I conclude that Stover and Baco did not invade the curtilage of Appellee's apartment.[8]

---

7. In the recent case of *Chiarini v. State,* 442 S.W.3d 318, 325 (Tex.Crim.App.2014), we held that a condominium owner's "undivided ownership interest in the common area of the condominium complex made the common area [his] 'own premises' under the [Unlawful Carrying Weapons] statute." That is to say, he could not be convicted for unlawfully carrying a weapon, since he carried the weapon on his "own premises." Tex. Penal Code § 46.02(a)(1). This holding has no bearing upon whether the threshold of Appellee's apartment constitutes "curtilage" for Fourth Amendment purposes.

8. The concurring opinion argues that "[a]n apartment should be afforded some curtilage that carries with it the same protections under *Jardines* as the curtilage of a house." Concurring Opinion at 2. Of course, I agree that whatever constitutes the "curtilage" of an apartment enjoys the same constitutional status as whatever constitutes the curtilage of a privately owned home. Nobody disputes that. And almost any home will have some "curtilage." Still, what constitutes "curtilage" will vary depending upon the nature of the dwelling involved. A rural farm house and an urban high-rise apartment are equally deserving of Fourth Amendment protection, but identifying their respective "curtilages" involves different considerations. Some might be concerned that the holding I would reach today would tend to favor well-off home-owners over their less affluent apartment dwelling neighbors. But any such discrimination is attributable to the nature of the dwellings themselves, not the economic status of their occupants. It is an unfortunate fact of life that homeless people have no curtilage at all, since they have no home from which the intimacies of domestic life may extend. Does the car in which the homeless man may be forced to live constitute a "home" in contemplation of *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)? Surely we would not regard the folding chair that a homeless man sets up on the sidewalk next to his parked car as "curtilage" simply to compensate for his poverty.

## Does *Jardines* Change the Concept of Curtilage?

Nothing about the Supreme Court's opinion in *Jardines* persuades me otherwise. In *Jardines,* the Supreme Court reiterated that the reasonable-expectation-of-privacy formulation for defining the parameters of a "search" for Fourth Amendment purposes, introduced in *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), was not exhaustive. 133 S.Ct. at 1414 (citing *United States v. Jones,* —— U.S. ——, 132 S.Ct. 945, 950–51 & n.3, 181 L.Ed.2d 911 (2012)). Instead, the *Katz* formulation had merely added to an already existing "baseline" of Fourth Amendment protection—a baseline "that for much of our history formed the exclusive basis for its protections: When 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a "search" within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'" *Id.* (quoting *Jones,* 132 S.Ct. at 950–51, n.3). Because the dog sniff in *Jardines* was an investigation conducted from the vantage of the curtilage of the defendant's home—and for that reason alone—it entailed an unconstitutional intrusion into the defendant's "house"—one of the very entities singled out for security from unreasonable searches by the Fourth Amendment, along with "persons, ... papers, and effects[.]"

That the defendant's front porch in *Jardines* constituted part of the curtilage of his house was taken by the majority as practically a given: "Here there is no doubt that the officers entered it: The front porch is the classic exemplar of an area adjacent to the home and to which the activity of home life extends." *Id.* at 1415 (internal quotations and citation omitted). The only question was whether the usual "license" implicit in the fact that convention allows the public to approach the front door of a residence to knock was broad enough to embrace the use of a trained canine to sniff the air outside the door for contraband drugs. *Id.* "There is no customary invitation[,]" the Supreme Court concluded, "to do *that.*" *Id.* at 1416. Thus, the "objective behavior" of the investigating police officers demonstrated that the purpose of their entry upon the curtilage did not fall within "what anyone would think [they] had license to do." *Id.* at 1417. It was for this reason that the majority concluded that the dog sniff amounted to a search—because it was facilitated by an unlicensed invasion of the curtilage. The Supreme Court considered any necessity to inquire about Jardines's expectation of privacy (if any—objectively reasonable or otherwise) to be rendered unnecessary by its "baseline" conclusion that the curtilage of his house had been invaded without his explicit or implicit permission. *Id.*

I do not believe any aspect of *Jardines* alters the validity of my conclusion that the area in front of Appellee's apartment did not constitute curtilage—either under *Jardines*'s "baseline" approach to determining what constitutes a search, or under *Katz*'s reasonable-expectation-of-privacy approach that *Jardines*'s "baseline" approach rendered unnecessary. Addressing first *Jardines*'s "baseline" approach, I ask: Was there an intrusion on Appellee's "house" within contemplation of the Fourth Amendment? Although the opinion in *Jardines* is less explicit than one might wish in saying so, Jardines's dwelling was a stand-alone "house" rather than an apartment in a multi-dwelling residential complex like Appellee's. 133 S.Ct. at 1414. Jardines was the "homeowner," not a renter, and the area "immediately surrounding his house" actually "belong[ed] to" him. *Id.* He therefore enjoyed the right to exclude others from his property, subject only to the "license" usually afford-

ed to outsiders to enter upon the curtilage insofar as custom—"the background social norms that invite a visitor to the front door"—allowed. *Id.* at 1415–16. Appellee could exercise no such right to exclude others from the area in front of his apartment. I therefore have no occasion in this case to conduct the same "scope-of-the-license" analysis that the Supreme Court undertook in *Jardines.* There simply was no physical intrusion upon any area "belonging to" Appellee to begin with, as there was in *Jardines.*

Appellee fares no better under *Katz* 's reasonable-expectation-of-privacy approach to the curtilage question. Here the question to ask is: Regardless of whether Appellee enjoyed an ownership interest (or even a possessory interest) in the area immediately surrounding the front door to his apartment, did he nevertheless evince a subjective expectation of privacy in that space, and would society recognize any such subjective expectation of privacy as objectively reasonable under the circumstances? *Katz,* 389 U.S. at 361, 88 S.Ct. 507 (Harlan, J., concurring). To me, the answer is "no" on both counts—for essentially the same reasons I have already concluded that Appellee cannot satisfy the *Dunn* standard for constitutionally protected curtilage. Nothing in the record establishes that Appellee subjectively expected the walkway at his front door to remain private, and he did not put it to

any use associated with the intimacies of the home even as some of his neighbors had done. In any event, given the highly exposed nature of all of the apartment walkways, I cannot conclude that any subjective expectation of privacy that Appellee or his neighbors may have manifested was objectively reasonable. *See State v. Williams,* 862 N.W.2d 831, 837–38 (N.D. 2015) (in a post-*Jardines* case involving a narcotics dog sniffing in the common hallway of a condominium complex, "the condominium building's common hallway was not curtilage," so the canine sniff did not constitute a search). I therefore persist in my view that Appellee has not established that anything amounting to the curtilage of his home was compromised.[9]

## Does Curtilage Even Matter?

There remains a colorable argument, suggested by Justice Kagan's concurring opinion in *Jardines,* that a drug dog sniff at the doorstep of a residence should be regarded as a search even if the dog is not on the curtilage. The argument posits that, because the dog's olfactory sense is capable of invading the interior of the home, and because the home is, as *Jardines* acknowledged, "first among equals" when it comes to Fourth Amendment protection, 133 S.Ct. at 1414, the use of a drug dog to detect contraband within the home constitutes a search. Justice Kagan's con-

9. The Court is careful today to limit its holding to dog-sniffs that occur at the very threshold of an apartment door. Majority Opinion at 11. But there is nothing talismanic about the threshold of a home. *See Illinois v. McArthur,* 531 U.S. 326, 335, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001) ("This Court has held ... that a person standing in the doorway of a house is 'in a public place,' and hence subject to arrest without a warrant permitting entry of the home."). Unless the police have actually *crossed* that threshold, or unless they have arrived at the threshold by way of a trespass or an invasion of the homeowner's

legitimate expectation of privacy, the Fourth Amendment is not implicated. In *Jardines,* the police physically trespassed upon the premises. There was no such trespass here. There is no evidence that Baco ever touched the threshold of the apartment door, much less crossed it. And it simply begs the question to reason that standing at the threshold of an apartment—"home" though it may be—is necessarily curtilage or constitutes an invasion of a legitimate expectation of privacy *per se,* no matter how freely accessible and observable to the general public the area immediately in front of that threshold may be.

curring opinion in *Jardines* articulated this position. While joining the majority's "baseline" approach, Justice Kagan, joined by Justices Ginsburg and Sotomayor, argued separately that, "[i]f we had decided this case on privacy grounds, we would have realized that *Kyllo v. United States*, 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001), already resolved it." 133 S.Ct. at 1419 (Kagan, J., concurring).

In *Kyllo*, the Supreme Court carved out the following rule:

> Where … the Government uses a device that is not in general public use [in *Kyllo* itself, a thermal imaging device], to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a 'search' and is presumptively unreasonable without a warrant.

533 U.S. at 40, 121 S.Ct. 2038. Following Justice Kagan's lead, and regarding a narcotics detecting dog to be a "device not in general use" that is capable of invading the interior of a home to discover what could not otherwise be known "without physical intrusion," at least one court since *Jardines* has held that a dog sniff conducted from outside the front door of a condominium unit constituted an invasion of the home itself, and was therefore a search. *See State v. Kono*, No. CR120264061, 2014 WL 7462049, at \*4 (Conn.Super.Nov. 18, 2014) (not designated for publication) ("The use of a drug detection dog to investigate the contents of a home is no less a 'sense-enhancing technology' not in general public use than was the thermal imaging device in *Kyllo*."). *See also, State v. Ortiz*, 257 Neb. 784, 600 N.W.2d 805, 814–17 (1999) (recognizing "some expectation of privacy to be free from police canine sniffs for illegal drugs in the hallway outside an apartment or at the threshold of a residence").

It is difficult to square this view, however, with earlier Supreme Court holdings with respect to the use of narcotics dogs. In *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), and *Illinois v. Caballes*, 543 U.S. 405, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005), the Supreme Court concluded that the use of a narcotics dog to sniff for contraband in luggage (*Place*) and a car (*Caballes*), respectively, did not constitute a search under the Fourth Amendment. These holdings were not predicated on any perceived lesser expectation of privacy inhering in these ordinarily protected personal "effects." Instead, the Supreme Court focused on the nature of the dog sniff itself. A narcotics dog is trained to alert only to the presence of illicit contraband. *See Caballes*, 543 U.S. at 409, 125 S.Ct. 834 ("[A] canine sniff by a well-trained narcotics-detection dog [is] 'sui generis' because it 'discloses only the presence or absence of narcotics, a contraband item.'") (quoting *Place*, 462 U.S. at 707, 103 S.Ct. 2637). It does not otherwise "explore details of the home that would previously have been unknowable without physical intrusion[.]" *Kyllo*, 533 U.S. at 40, 121 S.Ct. 2038. And a person has no reasonable expectation of privacy in possessing narcotics. *Caballes*, 543 U.S. at 408, 125 S.Ct. 834 (official conduct that does not compromise a legitimate interest in privacy is not a search, and possession of contraband does not implicate a legitimate privacy interest). Distinguishing *Kyllo*, the Supreme Court in *Caballes* observed that the thermal imaging device there was capable of detecting many intimate details of the interior of a home besides the possible presence of contraband. 543 U.S. at 409, 125 S.Ct. 834.[10]

---

10. *See* Kenneth J. Melilli, *Dog Sniffs, Technology, and the Mythical Constitutional Right to* *Criminal Privacy*, 41 HASTINGS CONST.L.Q. 357, 377 (Winter 2014) ("The drug dog simply

But "[t]he legitimate expectation that information about perfectly lawful activity will remain private is categorically distinguishable from respondent's hopes or expectations concerning the nondetection of contraband in the trunk of his car." *Id.* at 410, 125 S.Ct. 834.

Given the rationale underlying the holdings in *Place* and *Caballes*,[11] one court observed in 2004 that "[a] dog that can determine contraband's existence and nothing else is not a search, even when sniffing the exterior of a home." *Fitzgerald v. State*, 384 Md. 484, 864 A.2d 1006, 1016 (2004). *See also, United States v. Scott*, 610 F.3d 1009, 1015–16 (8th Cir. 2010) (rejecting the argument that a narcotics dog's sniff of "the exterior door frame" of the defendant's apartment from the common hallway was a search under *Kyllo*). After *Jardines*, of course, this observation must be qualified: A drug dog sniff outside the home is not a search so long as the dog is not invading the home's curtilage at the time. In a very recent post-*Jardines* case, the Sixth Circuit held that *Jardines* does nothing to unsettle the proposition that a dog sniff does not constitute a search under the Fourth Amendment so long as it is conducted by law enforcement from an area where they have a legal right to be. *United States v. Winters*, 782 F.3d 289, 306 (6th Cir.2015).[12] I think these opinions express the better reasoned view and would have the Court follow them here.[13]

## CONCLUSION

Because I believe Detective Stover and Baco did not invade the curtilage of Appellee's apartment, the drug sniff conducted at the threshold of Appellee's door, where they had a legal right to be, did not, in my opinion, constitute a search for Fourth Amendment purposes. In my opinion, the

indicates a yes or a no to the question of the presence of illegal drugs, and neither answer implicates any legitimate expectation of privacy. Moreover, because the drug dog cannot convey any other information, drug sniffs create no risk of intruding upon legitimately private matters.") (internal quotations and footnotes omitted).

**11.** *See also Indianapolis v. Edmond*, 531 U.S. 32, 40, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000) (citing *Place* for the proposition that a drug sniff of a car stopped at a highway checkpoint "does not transform the seizure into a search" because "an exterior sniff of an automobile does not require entry into the car and is not designed to disclose any information other than the presence or absence of narcotics").

**12.** In the recent case of *Rodriguez v. United States*, — U.S. —, 135 S.Ct. 1609, 191 L.Ed.2d 492 (2015), the issue was not whether the narcotics dog's drug sniff of the defendant's car constituted a search for Fourth Amendment purposes. Instead, the Supreme Court held that law officers may not extend the bounds of an ordinary traffic stop in order to effectuate that dog sniff without violating the defendant's Fourth Amendment protec-

tion against unlawful seizures of his person. *See id.* at 1615 ("[A] dog sniff is not fairly characterized as part of the officer's traffic mission."); *see also, Winters*, 782 F.3d at 304 (distinguishing the issue in *Rodriguez*).

**13.** *See* Melilli, 41 HASTINGS CONST.L.Q. at 379 ("The simple truth is that dog sniffs, and any other real or hypothetical technique that can disclose nothing more than the presence or absence of criminal activities, are not searches under the Fourth Amendment. It is clear from the operation of the Amendment that it was never designed with the ambition of insulating criminal activity from detection. In practice, the concealment of criminal behavior is often made possible by the Fourth Amendment, but only as a collateral cost of protecting our privacy for noncriminal matters. When a technique exists for exposing criminal evidence without any risk whatsoever of exposing legitimately private matters, the use of that technique is entirely consistent with Fourth Amendment values and concerns that constitutional freedoms are being eroded are misplaced.") (internal quotations and footnote omitted).

contrary judgment of the court of appeals should be reversed, and the cause should be remanded to the trial court for further proceedings consistent with this opinion. Because the Court instead affirms the judgment of the court of appeals, I respectfully dissent.